UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
                                          :
UNITED STATES OF AMERICA                  :        MEMORANDUM AND ORDER
                                          :
        -against-                         :        04-CR-232 (ENV)
                                          :
                                          :
DAN RUBIN,                                :
                                          :
                    Defendant.            :
                                          :
---------------------------------------------------------------- x

**VITALIANO, D.J.**

Dixie Chris Omni, LLC and RJP Investment Company, LLC ("movants") seek to

vindicate certain victim's rights recognized by the Justice for All Act / Crime Victims Rights Act

(CVRA), 18 U.S.C. § 3771, they claim were abrogated during the investigation and prosecution

of defendant Dan Rubin, who in March 2007 pled guilty in this criminal proceeding to one count

of securities fraud and one count of conspiracy to commit securities fraud. Movants' prayer for

relief includes a demand for the remand of Rubin (who was then awaiting sentencing),

modification of Dixie Chris Omni's restitution remedy and the ordered implementation of the

government's victim notification measures to ensure compliance with the CVRA.

I.      Background

The following chronology synthesizes events (a) as presented in the briefs submitted by

movants and the government and (b) as disclosed in oral argument held on May 8, 2008.

Broadly, the grievances advanced by movants flow from several intertwining fits and starts set

against the backdrop of a prosecution for boiler room securities fraud. Most critically from a

chronological perspective, though, it is uncontested that Rubin's original 2004 indictment in this

prosecution charged securities fraud that did not relate to the interests or victimization of

1

movants. It was not until May 8, 2006, with the filing of a superseding indictment, that Rubin would actually be charged within criminal conduct to which movants were directly linked as victims. In the interim between indictments, but only shortly after the first charging instrument had been filed, Rubin allegedly victimized movants, defrauding them of millions in another stock swindle. Also in the interim came enactment of the CVRA.

Movants take issue with a number of acts and omissions along the path of prosecution. They claim that the government and the Court failed in their respective responsibilities under the CVRA to prevent Rubin from engaging them (apparently as opposed to the universe) in business after his arrest. Together with allowing Rubin's continued ability to.leverage his property, occasionally travel overseas both before and after his plea and even walk "freely" on bond, these acts and omissions, they claim, represented an affront to their right to be protected from the accused. They contend further that the government's efforts to give required notice to Rubin's victims were deficient, leading to the infringement of their rights to be heard, to attend public court proceedings related to the case and to confer with the government at vital stages of the prosecution. Also lacking, movants argue, were the government's efforts to preserve their restitution interests.

A.    Timeline to Victimization

The government filed a criminal complaint on October 1, 2003, alleging that Rubin and others manipulated the share price of two companies, the Classica Group and Marx Toys and Entertainment Corporation. The complaint alluded to the defendants' possible stock manipulation or defrauding of other companies, but did not refer specifically to any of them, including Omni Energy Services Corp. ("Omni"). Without refutation, the government says that, at the point of initial complaint, fraud involving Omni stock was not part of their investigation. On the day following filing, Rubin was arrested, but released on bond secured by cash and real

2

property located in Florida.

Weeks before, movants claim, Rubin had obtained their Omni shares. Movants were to be wired $3.8 million by Rubin or his corporate alter-ego, Rubin Investment Group ("RIG"), as payment for the shares. After his October 2, 2003 arrest, as Rubin admitted in testimony, Rubin or RIG remained in possession of the Omni shares. Rubin subsequently sent to movants a proposed amendment to the Omni stock purchase agreements seeking to make a reduced payment by October 30, 2003, based in part on his misrepresentation that the government would not let him pay more than $3.2 million for the stock. The amendment was accepted by a representative of the movants. The new deadline, however, passed with no payment. On November 4, one of the movants contacted the government to inform it of the nonpayment. Movants now contend that the government did not mention the CVRA to them at that time – a claim that finds ample support in the fact that the CVRA was not passed into law until October of 2004 – nor did they inform movants that Rubin still possessed their Omni stock. Although movants do not deny that Rubin paid them the agreed upon amended figure on November 10, 2003, they claim to be still aggrieved because that price was far less than the stock's market value – $5.4 million on November 11, 2003. By December 1, 2003, Rubin had sold all of the Omni stock purchased from movants.

Fifteen days later, Rubin acquired a brownstone building located on East 81st Street in Manhattan (the "brownstone"). Rubin made a down payment of $665,000 in cash and obtained a $1.235 million purchase money mortgage to finance the acquisition.

B.     The Original Indictment, Bail Terms and Notice to Victims

On March 10, 2004, a grand jury returned an indictment charging Rubin and others with securities fraud, mail fraud and money laundering. In essence, the indictment charged two schemes: first, that the defendants fraudulently induced individuals and entities to part with

3

significant blocks of shares in exchange for promised consideration that the defendants knew would probably never be paid in full, and second, that the defendants manipulated the price of the shares of certain companies. The indictment listed several companies (again, not including Omni) and contemplated (but did not identify) other victimized companies. The indictment also listed assets of Rubin's that were possible targets of forfeiture, including $3.4 million in liquid funds, 3.2 million shares of 1-800-ATTORNEY (one of the companies that was identified in the indictment), the contents of four bank accounts held in the name of Rubin or RIG, and two properties in Florida. The government filed notices of pendency against the two Florida properties, but not, to movants' current dismay, the brownstone. On March 17, 2004, the government obtained a restraining order preventing Rubin from transferring or otherwise encumbering enumerated assets traceable to the crimes charged in the indictment, including the 3.2 million shares of 1-800-ATTORNEY and the bank account funds.

On December 21, 2004, United States District Judge David G. Trager ordered the $150,000 that had been posted as security for Rubin's bond released to pay for attorney's fees. The government consented to that application. On February 17, 2005, Rubin secured another mortgage on the brownstone through a $1.4 million loan from Wachovia Bank. This was followed, on April 1, 2005, by the entry of a second restraining order sought by the government barring Rubin from further dissipating the value of the restrained 1-800-ATTORNEY stock by any form of encumbrance or alienation without the consent of the United States Attorney's office.

With the objective of satisfying an obligation the recently enacted CVRA placed on the district court itself, on April 18, 2005, Judge Trager signed an order permitting the government to provide notice to victims via publication, as the market manipulation theory alleged in the indictment potentially affected tens of thousands of shareholders, making individual notice as

provided by the CVRA impracticable. The government also assured Judge Trager that it would send mail notice to the victims that had been located. This assurance, however, was not reflected in the signed order itself.

Also in April 2005, two of Rubin's co-defendants, Daniel Nourani and Glen Santha, pled to the securities fraud conspiracy and securities fraud counts. The minutes of these pleas were sealed.

On May 2, 2005, United States Magistrate Judge Robert M. Levy ordered Rubin's cash bail re-posted after the government asked for revocation of bail, based in part on the discovery of Rubin's misrepresentations regarding his financial condition. As with all prior proceedings, it is undisputed that movants did not receive specific notice of this hearing.

On August 18, 2005, the government published the notification ordered by Judge Trager in *USA Today*, directing potential victims of any stock price manipulation or fraud schemes involving Rubin and/or RIG to a victim notification website. The website was designed to permit victims to view charging documents and to identify themselves as victims to the United States Attorney's office. The Department of Justice maintained a separate but related Victim Notification System ("VNS") that provided notice of the progress of a given case to victims who had so identified themselves. Those victims, and others known to the Department of Justice, were periodically notified through the VNS, after it became fully operational, of court events via e-mail.[1]

Further down the prosecution timeline, on September 16, 2005, Rubin applied, with the government's consent, to have his bail cash released again. That request was granted. And, on April 3, 2006, Wachovia Bank loaned Rubin another $500,000 and received another mortgage on the brownstone, raising the total tally of mortgage loans encumbering the property to over $3.1

---

[1] The government has informed the Court that 156 identified victims, shareholders of companies identified in the original indictment, were given access to VNS.

million.

C.    Superseding Indictment

On May 8, 2006, a grand jury returned a superseding indictment against Rubin and a co-defendant, adding allegations of securities fraud involving several additional companies, including Omni. The government's supplemental theory charged the following fraudulent transactions in Omni stock: Dixie Chris agreed to sell Omni shares to Rubin for approximately $3.8 million, understanding that Rubin would convey the stock to certain designated investment entities rather than dump the shares on the open market and depress their value. Rubin, however, sold the Omni shares in the open market between September 26, 2003 and December 1, 2003, for almost $5 million. Meanwhile, after his October 2, 2003 arrest, Rubin had told Dixie Chris representatives that he could pay them no more than $3.2 million for the shares.

Upon return of the superseding indictment, the government did not seek seizure or restraint of any additional assets, although the forfeiture allegations stated the government's intention to seek a money judgment representing the gross proceeds obtained from the fraud schemes that had been charged. The superseding indictment also listed three substitute assets held in Rubin's name: two Florida properties and the brownstone. The government placed a *lis pendens* on each, but it did lift the restraint on one of the Florida properties in January 2007 after Rubin's attorneys requested that the government permit its sale.[2] Rubin's attorneys proposed that the proceeds be sent directly to Rubin's bank to pay down the second mortgage on the brownstone, reasoning that the sale would reduce monthly expenses and, in the end, preserve assets.

In October 2006, movants informed the government that they had filed a separate civil

---

[2] The filing of these *lis pendens* pre-dated this Court's decision in United States v. Kramer, 06-cr-200, 2006 WL 3545026 (E.D.N.Y. Dec. 8, 2006), finding that New York law does not permit such a filing on a substitute asset.

proceeding against Rubin and RIG in California, but that Rubin had not accepted service of process. Movants now complain that the government did not take that opportunity to volunteer Rubin's current address, which differed from the address at which movants were attempting service.

A month later, Rubin requested and was granted permission to travel to Israel to visit his fatally ill uncle. The government did not oppose the request, and Rubin, who had complied with all bail conditions to that point, was allowed to travel by Judge Trager's order. He was also allowed to travel several times thereafter, movants complain, despite the government's knowledge of other alleged incidents of criminal conduct beyond the superseding indictment that the government intended to introduce at trial, some of which involved the very family he was visiting.

### D.    Guilty Plea

Rubin pled guilty in March 2007, and agreed to the entry of a judgment of criminal forfeiture in the amount of $2 million. As part of the plea deal, the restraining orders on Rubin's properties were vacated. His plea was not scheduled until shortly before its occurrence, and was not added to the open notification website until July 2007. It was never added to the VNS system. Movants claim that subsequent to the plea deal agreed to by Rubin and the government they asked the government not to lift the restraining orders, only to be told that once Rubin had paid the $2 million, the remaining property had to be released.

As would be expected, of course, the plea did not satisfy movants' concerns; it only heightened them. Movants would soon seek from the government records of trading in Dixie Chris shares by Rubin and / or RIG. The government informed them that a subpoena and possibly a court order would be required because the records being sought had themselves been obtained through grand jury subpoenas and were subject to grand jury secrecy. The government

received the subpoena in October 2007, and apparently did not respond before this motion was filed on April 4, 2008.[3]

The government insists in defense that, throughout the Rubin investigation and prosecution, it kept movants informed of the progress of the case, and hints, along with Rubin's current attorney, that movants may have been motivated by their alleged offer to Rubin to use the CVRA to undo Rubin's guilty plea in exchange for a favorable settlement of their ongoing civil suit in California state court. Movants take vigorous exception to any suggestion that their CVRA motion is part of an effort to extort a settlement from Rubin and parry that they were never formally informed of, much less able to enjoy the benefit of, their rights under the CVRA even as the government continued to request, and receive, their aid in preparing for Rubin's trial.


II.     The Crime Victims Rights Act

A.      The Legislative Scheme

The CVRA became law on October 30, 2004. The Act guarantees the victims of federal crimes an array of substantive and participatory rights that are enforceable in the district court where the respective crimes are charged.[4] Specifically, the statute enumerates the following eight rights:

> (1) The right to be reasonably protected from the accused.
> (2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
> (3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines

---

[3] Movants have indicated their willingness to move to obtain these materials, which appear to be largely grand jury materials, under Rule 6(e) of the Federal Rules of Criminal Procedure. The government has indicated its willingness to assist movants in acquiring the relevant materials.

[4] Victims can assert their rights to relief under the CVRA in the district court in which the defendant is being prosecuted (or, if there is no prosecution, where the crime occurred). 18 U.S.C. § 3771(d)(3).

that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5) The reasonable right to confer with the attorney for the Government in the case.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

18 U.S.C. § 3771(a). The statute charges the district court with ensuring that the victims of crime are afforded these rights, and the court must state the reasons for any decision denying relief sought under the provisions of the CVRA on the record. 18 U.S.C. § 3771(b). Although the statute primarily tasks the courts with the responsibility of securing these rights, prosecutors and other relevant agents of the Department of Justice are commanded to "make their best efforts to see that crime victims are notified of, and accorded" their rights under the CVRA. 18 U.S.C. § 3771(c)(1).

Once a victim has asserted a violation of a right guaranteed by the CVRA, the district court must take up and decide any such motion "forthwith." Id. So far as the Court can divine, however, victims in this posture are not accorded formal party status, nor are they even accorded intervenor status as in a civil action. Rather, the CVRA appears to simply accord them standing to vindicate their rights as victims under the CVRA and to do so in the judicial context of the pending criminal prosecution of the conduct of the accused that allegedly victimized them.[5]

---

[5] The CVRA does not prescribe any specific form of action victims must follow when seeking judicial enforcement of a victim's right. Since the clause specifying the proper venue for CVRA motions indicates that they are to be asserted in the district court where the accused is being prosecuted or, "if no prosecution is underway, in the district court in the district in which the crime occurred," 18 U.S.C. § 3771(d)(3), the CVRA envisions the possibility of judicial vindication of certain CVRA rights outside the context of an actual prosecution. Indeed, nothing in the CVRA would seem to preclude such a wholly separate miscellaneous proceeding even if there was a criminal prosecution pending. See In re Dean, No. 08-20125, 2008 WL 1960245 (5th Cir. May 7, 2008) (CVRA motion originated by the government as a pre-prosecution miscellaneous proceeding). Further, the ability to seek pre-prosecution relief

9

Although the CVRA is meant to be liberally construed within the confines of the rights guaranteed, there is absolutely no suggestion in the statutory language that victims have a right independent of the government to prosecute a crime, set strategy, or object to or appeal pretrial or in limine orders entered by the Court whether they be upon consent of or over the objection of the government. Quite to the contrary, the statute itself provides that "[n]othing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." 18 U.S.C. § 3771(d)(6). In short, the CVRA, for the most part, gives victims a voice, not a veto.

### B. The Scope of "Victim" Status Under the CVRA

The government does not contest that movants are "victims" for purposes of the CVRA, but rightly notes the existence of significant questions about whether and when movants acquired vindicable rights under the Act, given that a number of the claims movants make relate to acts or omissions occurring prior to the filing of the May 2006 superseding indictment.[6]

Under 18 U.S.C. § 3771(e), a "crime victim" for the purposes of the CVRA is "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." Further, the CVRA applies only to court proceedings "involving an offense *against a crime victim.*" 18 U.S.C. § 3771(b)(1) (emphasis added). At least one court in this district has held that the clear due process concerns implicated by such a statute are resolved

---

also suggests that the alleged malefactor is not a necessary party in every instance. Here, movants noticed, without objection, their application within the pending criminal prosecution, thus giving notice to defendant Rubin and affording him as a party to the pending criminal proceeding an opportunity to be heard even with respect to grievances about which he was not necessarily entitled to receive notice.

[6] Among these, for example, is the claim that movants were entitled under the CVRA to notice and the right to confer with the government prior to the presumed (by movants) dismissals of defendants Nourani and Santha, which movants do not contest involved action occurring long before the filing of the superseding indictment which first asserted criminal conduct that movants claim victimized them.

by including in the category of victims "any person who would be considered a 'crime victim' if the government were to establish the truth of the factual allegations in its charging instrument." United States v. Turner, 367 F.Supp.2d 319, 326 (E.D.N.Y. 2005). Turner, more specifically, went on to adopt "an inclusive approach" to determining whether the victims under that definition included individuals victimized by "uncharged" crimes, concluding that "absent an affirmative reason to think otherwise, I will presume that any person whom the government asserts was harmed by conduct attributed to a defendant, as well as any person who self-identifies as such, enjoys all of the procedural and substantive rights set forth in § 3771." Id. at 327.

In Turner, of course, Magistrate Judge James Orenstein recognized several difficulties of an interpretative, practical and constitutional variety in reaching his conclusion as to the definition of "victim." Most unfortunately, given the absence of specific statutory definition, the legislative history of the CVRA on this point yields, at best, mixed signals. See id. at 326, 327 (noting Senate debate explaining that § 3771(e) employs "an intentionally broad definition because all victims of crime deserve to have their rights protected, *whether or not they are the victim of the count charged*" (emphasis in original) while also noting enactment by Congress with the knowledge that similar language in an earlier victims' rights bill had been interpreted *not* to refer to uncharged conduct). Navigating in such uncharted waters makes all the more evident the practical shortcomings of a system in which a court "must rely on the government, or the victims of such alleged conduct themselves, to bring their status to the court's attention." Id. at 327.

Quite understandably, movants perceive their victimization as having begun long before the government got around to filing the superseding indictment. They also believe their rights under the CVRA ripened at the moment of actual victimization, or at least at the point when they

first contacted the government. Movants rely on a decision from the Southern District of Texas for the notion that CVRA rights apply prior to any prosecution. In <u>United States v. BP Products North America, Inc.</u>, the district court reasoned that because § 3771(d)(3) provided for the assertion of CVRA rights "in the district court in which a defendant is being prosecuted for the crime or, *if no prosecution is underway,* in the district court in the district in which the crime occurred," the CVRA clearly provided for "rights… that apply before any prosecution is underway." <u>United States v. BP Products North America, Inc.</u>, Criminal No. H-07-434, 2008 WL 501321 at *11 (S.D.Tex. Feb. 21, 2008) (emphasis in original), *mandamus denied in part,* <u>In re Dean</u>, No. 08-20125, 2008 WL 1960245 (5th Cir. May 7, 2008). But, assuming that it was within the contemplation and intendment of the CVRA to guarantee certain victim's rights prior to formal commencement of a criminal proceeding, the universe of such rights clearly has its logical limits. For example, the realm of cases in which the CVRA might apply despite no prosecution being "underway," cannot be read to include the victims of uncharged crimes that the government has not even contemplated. It is impossible to expect the government, much less a court, to notify crime victims of their rights if the government has not verified to at least an elementary degree that a crime has actually taken place, given that a corresponding investigation is at a nascent or theoretical stage. <u>See</u> <u>United States v. Merkosky</u>, No. 1:02-CR-0168-01, 2008 WL 1744762 (N.D. Ohio Apr 11, 2008) (CVRA does not confer any rights upon a victim where no prosecution has begun or even been considered).

The abstract takes on concrete form here. In this case, movants contacted the government with word of Rubin's alleged fraudulent acquisition of Dixie Chris's Omni stock on November 4, 2003. However, the government's initial charging instrument did not reflect Rubin's alleged involvement with Omni, nor did its investigation yet extend beyond a market manipulation theory to a securities fraud theory that would ultimately link Rubin to movants.

Notwithstanding, movants also seek relief for CVRA-guaranteed rights they claim were breached in this temporal lacuna. Each alleged breach, of course, must be individually evaluated.

### C. The Statutory Rights of Victims

#### 1. Right to be Reasonably Protected from the Accused

Movants claim their rights under the CVRA were abrogated when Rubin defrauded them after he had been initially arrested by federal authorities. They argue that the government should have frozen the accounts and assets of Rubin and RIG or otherwise prevented them from conducting fraudulent securities activities. Movants claim to be further aggrieved when Rubin was subsequently allowed to visit Israel while awaiting trial. Relying on the open-ended injunction of the Congress to liberally construe the rights guaranteed by the CVRA, movants fasten on this first enumerated right as a wellhead of boundless authority to fashion protection for victims in the guise of "protecting them from the accused."

Putting aside for the moment the begged question of by whom Rubin would have been "accused" at that point, the Court notes that the first harm about which movants complain actually antedates the enactment of the CVRA, given that it is uncontested that Rubin's alleged sale of movants' Omni shares was transacted on December 1, 2003. But assuming that the CVRA had been in effect, the result would not differ. Simply put, the "accused" must be accused by the government, not just by someone complaining to the government that they have been the victim of a crime. The CVRA cannot realistically be read to create upon mere citizen complaint a self-effectuating right to protection from the one accused, regardless of its impact on resources, any pending investigation or prosecutorial discretion. Rationally, "accused" must mean accused by criminal complaint, information or indictment of conduct victimizing the complainant. The right created or acknowledged by the CVRA to be "reasonably protected from the accused" cannot have ripened before the earliest of one of these happenings. Therefore, even

if the CVRA had been in effect on December 1, 2003, since Rubin had not been "accused" of any crime allegedly victimizing movants, this provision of the CVRA would have bestowed on them no right beyond that of general law to be protected from criminal conduct by Rubin or anyone else.

With respect to the enlargement of Rubin's bail conditions to visit Israel prior to the filing of the superseding indictment, the same fate would befall movants' claims. It is true, though, that trips to Israel were permitted after the superseding indictment was filed as well. These decisions, of course, are within the ambit of CVRA considerations. Nevertheless, movants' objections in reliance on the right to be protected from the accused are misplaced. In the only known case to interpret this provision, Judge Orenstein noted that the right to be reasonably protected from the accused "appears to add no new substance to the protection of crime victims afforded by the Bail Reform Act, which already allows a court to order reasonable conditions of release or the detention of an accused defendant to 'assure... the safety of any other person.'" Turner, 367 F.Supp.2d at 332. Nothing in the CVRA "appear[s] to change the substantive bases on which a defendant can be released or detained." Id. Stated differently, other law already empowered courts determining bail release conditions to consider the very concerns movants assert the CVRA mandates they consider. On this score, then, this provision of the CVRA adds nothing new.

At oral argument, movants also suggested that their right to be reasonably protected from the accused should have compelled the government to pursue a larger forfeiture amount and/or seek to restrain other assets of Rubin and RIG. This argument fails in several respects. First, forfeiture, to be determined pursuant to 18 U.S.C § 981, permits at the start of a prosecution the designation of assets for forfeiture based upon their traceability to the alleged offense; it is a matter of proof, not simply punishment. Moreover, forfeiture, although penal, is not part of

14

restitution, which is also penal. Forfeiture and restitution, as a matter of fact, frequently compete for the same assets of a convicted defendant; they may do so again here. A larger forfeiture order, even if arguably provable, would likely have practically undermined attempts by movants and other victims to secure restitution.

Second, the Court reads the protection of restitution rights guaranteed under the CVRA as being controlled by the specific provision of the Act concerning restitution, as opposed to being secured by some amorphous grant of general power to protect a victim from the accused. Ordinary principles of statutory construction require that when, as here, a statutory text lists a number of items seriatim, as in the rights enumerated in 18 U.S.C. § 3771(a)(1-8), "the specific qualifications in one provision cannot be overridden by a general catch-all clause" among them. Tachiona v. United States, 386 F.3d 205, 217 (citing Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 113, 121 S.Ct. 1302, 149 L.Ed.2d. 234 (2001)). Reading restitution-related rights beyond those in the relevant provision of the CVRA into a general right to be protected from the accused would render the former provision superfluous. To the extent, then, that movants have placed their claimed restitution rights in issue, that issue will be addressed only in line with the relevant provision of the CVRA expressing the statutory will of Congress regarding restitution.

## 2.  Right to Reasonable, Timely and Accurate Notice

The CVRA provides victims with the right to "reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused." 18 U.S.C. § 3771(a)(2). Movants argue that their rights – and all victims' rights in this case – were routinely ignored by the government and, derivatively, by the Court. Specifically, they allege that the government failed to give movants notice of their CVRA rights, that the government's notice by publication was inadequate, that the Court did not request proof of any mailings to identified victims advising them of their CVRA rights and that the Court

and the government should have revisited the issue of notification after the superseding indictment was filed.

To be clear, the retrospective portion of movants' application does not challenge the account of events as reflected on the docket. They do not challenge that Judge Trager signed an order on April 18, 2005 permitting the government to fulfill its notice obligations through publication. The order came at a stage in the case when, under the market manipulation theory then advanced by the government, notifying all victims would have been impracticable. Victims, that is, the universe of those who had been involved in securities transactions with Rubin and/or RIG, were directed by the notice Judge Trager ordered to a website where they could learn about the pending case, identify themselves to the government, and sign on to the VNS website that would provide continuing notice of the progress of the case. Although the order ultimately did not reflect it, Judge Trager signed the order having been assured by the government, on the record, that it would also send mail notice to victims that the office had located by address, notwithstanding notice by publication.

For its part, the CVRA mandates that where direct notice is impracticable, the Court "shall fashion a reasonable procedure to give effect to this chapter that does not unduly complicate or prolong the proceedings." 18 U.S.C. § 3771(d)(2). At the time Judge Trager entered his order, the CVRA was a newborn; bench and bar had to adjust rapidly to its novel requirements and develop methods and systems to implement them. Since Judge Trager signed his order, opinion has diverged as to whether the VNS can serve as an adequate mechanism for the fulfillment of the notification requirement of § 3771(d)(2). See United States v. Ingrassia, No. 04-cr-455 (ADS)(JO), 2005 WL 2875220 (E.D.N.Y. Sept. 7, 2005) (rejecting the government's application to rely upon VNS as part of an "alternate procedure" in part because the Court had not specifically approved it and in part because its information was occasionally

16

inaccurate, incomplete or passively delivered to victims); but see United States v. Saltsman, No. 07-CR-641 (NGG), 2007 WL 4232985 (E.D.N.Y. Nov. 27, 2007) (finding notification through published notice directing potential victims to the website "a reasonable procedure that will both give effect to the CVRA and will not unduly complicate or prolong the proceedings" given the vast number of victims). That courts differ in the application of alternative notification procedures to their respective cases is not surprising, given their proximity to the particular facts and needs of victims that also will likely vary with each case. Cf. In re W.R. Huff Asset Management Co., LLC, 409 F.3d 555, 562-63 (2d Cir. 2005) (noting that each "district court is in a better position than [the Court of Appeals] to decide whether or not relief is warranted under the CVRA... as it has far more insight into the complexities of a pending litigation," and is "far better positioned to make these assessments and to determine what constitutes 'a reasonable procedure' for effecting these rights."). And, of course, with time and experience, glitches and kinks are resolved in any system. Whatever the possible alternate approaches may have been in 2005, the government and Judge Trager attempted to comply with the notice-giving requirements of the CVRA. Considering that the notification ordered by Judge Trager included in actual practice direct mail notice to victims the prosecutor's office had located, the Court will not disturb Judge Trager's implicit finding of reasonableness.[7] This is especially so since no one other than movants has ever complained about any inadequacy in the CVRA notice in this case and even movants, as they indicated at oral argument, do not complain prospectively about it now.

Of greater consequence is the reality that movants did not find themselves on the list of

---

[7] That the government's representation it would provide notice by mail was not included in the signed order is of little concern. The statute does not require a written order; it requires a "procedure." Judge Trager's reliance on the government's on-the-record representation that it would send mail notice to victims has no bearing on whether an appropriate procedure was approved in fact.

victims to be noticed until March 2008. It goes without saying that movants would have had the right to accurate, reasonable and timely notification of major court proceedings involving Rubin during the period between the filing of the superseding indictment in May 2006 and their actual receipt of the CVRA notice in March 2008. However, the government maintains, and evidence reviewed by the Court (including representations by movants' counsel) seems to suggest, that Dixie Chris was generally kept abreast of court proceedings throughout the prosecution. Nonetheless, the CVRA would have specifically entitled movants to reasonable notice of (1) any hearings on Rubin's requests to leave the country to attend the funerals of family members, (2) Rubin's plea and (3) Rubin's sentencing. Movants persist that the government failed in that obligation.

In evaluating their grievance, as Judge Orenstein noted in <u>Turner</u>, the Court must be mindful that the use of the term "reasonable" in the CVRA "provides vital flexibility" in its application. <u>Turner</u>, 367 F.Supp.2d at 332. Each of Rubin's requests to leave the country for funerals and / or the pending deaths of family members overseas, for example, was made under exigent circumstances, and delaying for notice reasons would not have been reasonable. The considerations behind the security provided for his temporary release would not have been altered by movants' (or other victims') input in a manner that rendered delay for their notice any more reasonable. Furthermore, for the most part, such requests are routinely handled without court appearance or may arise without prior notice during a status conference, much less be considered at a "public proceeding" scheduled for that purpose. Such was the case here — none of the travel requests complained of by movants arose by way of motion and no hearing for which the CVRA could have arguably entitled them to notice was held.

Similarly, viewed simply from the perspective of reasonable notice, Rubin's plea does not present any substantive CVRA problem, as movants do not dispute having been aware in

advance of his plea date. Again, as to Rubin's sentencing, movants, following hearing on this motion, were made aware of and were allowed to participate reasonably at the sentencing hearing.

### 3.    Right Not to Be Excluded from Public Court Proceedings

The CVRA protects victims from being "excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding." 18 U.S.C. § 3771(a)(3). "The phrasing of this provision does have important implications for all proceedings in a criminal case: the right is phrased in the negative ( i.e., the crime victim has the right 'not to be excluded') rather than as an affirmative right to attend." Turner, 367 F.Supp.2d at 332. "The negative phrasing also suggests that the fact that a properly notified victim cannot be present is not in itself a circumstance that requires a proceeding to be adjourned." Id.

Movants originally claimed that this right was effectively abrogated when co-defendants Santha and Nourani suddenly ceased to be listed as active defendants in the case. Movants had, it seems, assumed that charges against Santha and Nourani had been dismissed. The government has since enlightened them; Santha and Nourani have not only pled, but they pled guilty to the highest possible offense charged, foreclosing any option of re-opening either plea. See 18 U.S.C. § 3771(d)(5) ("a victim may make a motion to re-open a plea or sentence only if... in the case of a plea, the accused has not pled to the highest offense charged."). See also Ingrassia, 2005 WL 2875220 at *19 (interpreting "highest offense charged" as the offense carrying the most severe penalty under the sentencing guidelines).

More to the point, Santha and Nourani pled long before the filing of the superseding indictment; that is to say, before movants had any standing under the CVRA. Regardless, upon

being advised that those co-defendants had pled rather than been dismissed, movants wisely withdrew this request for relief.[8]

### 4.     Right to Be Heard Reasonably at Public Court Proceedings

The CVRA, in addition, provides victims with the "right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding." 18 U.S.C. § 3771(a)(4). Movants' complaint under this section is an elaboration of the exclusion argument, that is, movants were effectively denied the opportunity to be heard at earlier hearings on release, modification of conditions of release or defendant Rubin's plea. Correspondingly, the analysis of the previous right applies here with equal force.

It is, perhaps, with this enumerated CVRA right, though, that it is most important to underline what the CVRA does not empower victims to do. The right to be heard does not give the victims of crime veto power over any prosecutorial decision, strategy or tactic regarding bail, release, plea, sentencing or parole. See In re W.R. Huff, 409 F.3d at 564 ("Nothing in the CVRA requires the Government to seek approval from crime victims before negotiating or entering into a settlement agreement."). And, even where a plea has been entered, a victim may only move to reopen the plea if the accused has not pled to the highest offense charged under 18 U.S.C. § 3771(d)(5). Plus, if a plea is reopened, the CVRA then only entitles the victim to be reasonably heard as to why the Court should not accept the plea on the otherwise agreed terms.[9]

---

[8] Movants had, alternatively, sought to unseal the docket regarding these defendants in an attempt to learn what had become of them. Although movants withdrew their alternate requested relief as well, the Court observes that the denial of access to sealed court documents does not represent a physical exclusion from court proceedings.

[9] Sentencing is no different. Here, movants were given notice of the scheduled sentencing date for defendant Rubin. They indicated that they desired to be heard at that time, and were, of course, permitted to be heard. Movants had indicated further at oral argument that they might need additional time to prepare for the sentencing and, in a bizarre turn, effectively renew the motion to postpone sentencing previously made by Rubin, which the Court had denied. Movants, in the end, did not seek an adjournment and the sentencing proceeded as scheduled.

Lastly, even assuming that movants formally introduced to the case as victims with the May 2006 superseding indictment were not fully accorded their right to be heard under the CVRA, the Court finds it hard to fathom what relief would be available now for past sins. Rubin's plea and those of his co-defendants, as pleas to the highest offense charged, cannot be disturbed. And, while the Court finds that that delaying Rubin's visit to Israel for the impending death and /or funeral of his uncle and mother in order to allow victims to be heard on the subject would not have been "reasonable," even if the movants were entitled to such an opportunity, it is difficult to imagine any retroactive remedy. Rubin, in other words, cannot undo his visits to Israel. In the absence of an action for money damages – a legal impossibility, given the utter dearth of evidence that Congress intended to waive sovereign immunity to provide such redress for victims under the CVRA – there appear to be within the CVRA's intendment a number of identifiable wrongs for which there exists no practical retrospective remedy.

While the Court's observation about this remedial conundrum is important for future application of the CVRA, it must be emphasized that the actual finding here is that no violation of movants' right to reasonably be heard at public proceedings occurred given Judge Trager's approval as reasonable and adequate the notification procedure proffered by the government at the start. But even if a contrary conclusion were to be reached, it would appear that several of the complaints raised by movants under this and other similar CVRA provisions lack any conceivable remedy beyond an admonishment to the government and a demand for assurances by the government that the conduct would not be repeated. As to relief for such past breach, the CVRA rings hollow.

### 5. Right to Confer With the Government

While admitting that the government has conferred with them on numerous occasions throughout the prosecution, movants object that the government has not provided information

with which to pursue restitution in this case and in their civil suit. Relying on the <u>BP Products</u> case, movants argue that the right to "obtain and provide information and to express opinions" necessarily includes the right to "obtain information on which to base views to express to the court." <u>BP Products</u>, 2008 WL 501321 at *15.

Any information-gathering aspect of the right to confer is necessarily circumscribed, in the first instance, by its relevance to a victim's right to participate in the federal criminal proceedings at hand and to do so within the bounds demarked by the CVRA. See <u>Ingrassia</u>, 2005 WL 2875220 at *17 (CVRA "no more requires disclosure of the pre-sentence report to meet its remedial goal of giving crime victims a voice in sentencing than it does disclosure of all discovery in a criminal case to promote the goal of giving victims a voice at plea proceedings.") The CVRA, therefore, does not authorize an unbridled gallop to any and all information in the government's files. Conferring with and seeking information from the government in connection with restitution to be sought in an actual criminal proceeding, by contrast, would appear to be well within these bounds.

On this score, the government acknowledges that it may have documents which fit the bill but that such documents are grand jury records subject to the secrecy of Rule 6(e) of the Federal Rules of Criminal Procedure. Access to this species of records may, under some circumstances, not be within the "reasonable" sphere of rights provided by the CVRA.[10] Since briefing on this motion, the government has provided movants with schedules setting forth information based on the grand jury materials that may, along with continued efforts to obtain the remainder of the grand jury material, fulfill movants' requests. At oral argument, moreover,

---

[10] Situations in which, for example, a confidential source may be compromised or endangered come to mind. If contested, future litigation will undoubtedly address the question of whether requests for grand jury material represent a per se unreasonable assertion by a victim of the right to confer under the CVRA.

the government pledged to continue such efforts, to movants' apparent satisfaction.[11] With the issue of access apparently now moot, at least in part because this motion was interposed, the Court declines to rule further on it at this time.

6.     Right to Full and Timely Restitution

The CVRA provides for the right of full and timely restitution only *"as provided in law."* 18 U.S.C. § 3771(a)(6) (emphasis added); see also In re W.R. Huff, 409 F.3d at 563 ("Congress recognized that there would be numerous situations when it would be impossible for multiple crime victims of the same set of crimes to be repaid every dollar they had lost"). Movants complain that the government submitted on behalf of victims a restitution claim for approximately $650,000, an amount, they argue, that significantly undervalues their loss.

The Court recognizes that, under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, restitution is required where, as here, there is a guilty plea to securities fraud charges. See United States v. Brennan, 526 F.Supp.2d 378, 382-391 (E.D.N.Y. 2007). The government must submit an appropriate report for the purpose of creating a restitution order. "To facilitate the preparation of this report, the government, upon request of the probation officer, is required to consult with victims and, not later than sixty days before the sentencing date, detail any losses subject to restitution." Id. at 384 (citing the requirements of 18 U.S.C. § 3664(d)(1)). The government states that prior to submitting its report, it engaged in ample discussion with movants about the losses that resulted from their dealings with Rubin. Movants contend, however, that they were not consulted specifically about the amount that the government would seek in restitution, and that their rights to full and timely restitution were

_____

[11] Movants originally claimed that the "reasonable right to confer with the attorney for the Government" under U.S.C. § 3771(a)(5) entitled them to consult with them before the dismissal of defendants Nourani and Santha. Because no such dismissal took place, movants have withdrawn this protest. Even if there had been a dismissal rather than a plea, the events took place long before movants could rightly be termed victims under the CVRA.

23

therefore violated.

A victim's rights of restitution under the MVRA, and in turn the CVRA, hinge on to what degree the former requires victims to engage in these discussions. Under 18 U.S.C. § 3664(d)(1), the government is to consult, "to the extent practicable, with all identified victims" in order to "promptly provide the probation officer with a listing of the amounts subject to restitution." The "consultation" required to generate that list is not akin to the information exchange provided by the CVRA, which includes the right to express opinions. Rather, the Court reads the MVRA's "consultation" requirement as requiring the government to gather from victims and others the information needed to list the amounts subject to restitution in the report. This is a purely fact-driven communication. Such consultation does not require the victim's seal of approval, or even solicitation of the victim's opinion beyond those facts that would assist the government's required calculations. Unlike the general right to confer under the CVRA, MVRA consultation is not an inherently collaborative effort. The MVRA requires the consultation of victims, but clearly only for gathering the necessary information, not for the solicitation of creative input. Because the CVRA provides for the right of restitution only as provided by law, the Court likewise finds no CVRA violation under the subsection concerning restitution as long as the government adheres, as it did here, to its obligations under the MVRA.[12]

Collaterally, movants have also suggested in their briefing and oral argument that their right to restitution was violated when the government only pursued $2 million of Rubin's assets in forfeiture proceedings, and that the CVRA provides a right for the movants to ascertain whether the forfeited $2 million is, in fact, the money movants lost in transactions with Rubin. Yet again, recognizing that the CVRA only mandates restitution as provided by law, the Court

---

[12] The Court notes that the actual restitution process will be the subject of a hearing now scheduled for July 31, 2008. The victims, per their CVRA right to be heard, will have a proper opportunity to offer their views as to appropriate restitution remedies at that time. The final order of restitution will, ultimately, be determined by the Court.

notes that no law transforms forfeiture into a pool for restitution, nor does any law peg pre-judgment assets of the accused to restitution as does the law of forfeiture peg for forfeiture assets directly traceable to an actual offense. Bluntly and simply, forfeiture and restitution are parallel, and therefore separate, processes.[13]

### 7. Right to Proceedings Free from Unreasonable Delay

Movants claim that numerous delays in prosecution that are unexplained, or occurred for the convenience of either the government or a defendant, run counter to the CVRA's articulated right to proceedings free from unreasonable delay under 18 U.S.C. § 3771(a)(7). Specifically, movants contend these delays injured them financially because an incidental consequence of the delays was a decline in the value of the underlying object of the restitution claim, the Omni stock. With respect to delays in prosecution, the CVRA "appears to add little if anything substantive to existing law... [except it] does appear to confer participatory rights on the victim", Turner, 367 F.Supp.2d at 334, that is, the right to object to delay and ask the Court to hold both government and defendant to what the Speedy Trial Act already requires. And, most obviously, to the extent that any past delays in the proceedings took place, the horse has already left the barn.[14] Going forward, though, movants will be heard on scheduling and the Court will continue

---

[13] This is not to say restitution and forfeiture must always remain on parallel tracks. Though Congress did not compel that the forfeiture pool must be applied first to restitution or that restitution have first call on a defendant's assets, either in the CVRA or elsewhere, the government can make forfeiture assets available for restitution. In fact, movants and the government are currently engaged in joint efforts to secure at least partial restitution from Rubin's forfeiture amount by application to the Department of Justice. Although the outcome is uncertain at this point, the Court applauds these efforts.

[14] The Court further finds, after surveying the docket, that what delays have taken place were, in fact, reasonable. "The Senate sponsors of the CVRA were explicit in their view that the statutory right to proceedings free from unreasonable delay neither 'curtail[s] the Government's need for reasonable time to organize and prosecute its case' nor 'infringe[s] on the defendant's due process right to prepare a defense.'" Turner, 367 F.Supp.2d at 334 (quoting 150 Cong. Rec. S4268-69 (statement of Sen. Kyl)). In any event, even if some of the delay in prosecution was unreasonable, since Congress could have but did not provide an

its efforts to prevent any future unreasonable delay.

8.    Right to Fairness, Respect, Dignity and Privacy

The CVRA also lists among the rights secured to a victim the right to "be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(8). As Magistrate Judge Orenstein observed in <u>Turner</u>: "Neither the text of the statute nor its legislative history provides guidance as to what specific procedures or substantive relief, if any, Congress intended this provision to require or prohibit." <u>Turner</u>, 367 F.Supp.2d at 335. While this provision must be read liberally as giving courts and the government the mission to do all that they can to vindicate a victim's legitimate requests for fairness, respect and dignity, the Court doubts, strongly, that the authors of the statute succeeded in doing more. It is hard to comprehend, in any case, how a court presiding over the prosecution of a defendant could engage in sidebar dispute resolution between a victim and the government regarding the strategic decisions of the government about the very prosecution the Court is to try impartially.

At oral argument, movants further suggested that the government and Rubin were harming their interests in fairness, respect and dignity by essentially accusing the Omni victims of extortion relating to their posture in this case. Although the question of movants' motivation will itself not be addressed in this opinion because it was found irrelevant to the disposition of this motion, the Court refuses to adopt an interpretation of (a)(8) that prohibits the government from raising legitimate arguments in support of its opposition to a motion simply because the arguments may hurt a victim's feelings or reputation. More pointedly, such a dispute is precisely the kind of dispute a court should not involve itself in since it cannot do so without potentially compromising its ability to be impartial to the government and defendant, the only true parties to

---

action for monetary damages, there is no practical remedy for any harm flowing from past delay.

the trial of the indictment.

D.        Notification of Rights

The strongest accusation advanced by movants is anchored in what was apparently ineffective notification by the government to movants of their specific rights under the CVRA before March 2008. See 18 U.S.C.A. § 3771(c)(1) ("Officers and employees of the Department of Justice and other departments and agencies of the United States engaged in the detection, investigation, or prosecution of crime shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a)."). Entitlement to these rights was triggered no later than the May 2006 filing of the superseding indictment alleging Rubin's involvement in a fraudulent scheme targeting Omni securities. The failure of the government to satisfy its affirmative obligation under the CVRA as well as its understanding with Judge Trager to notify movants of the existence of their CVRA rights promptly can be neither explained nor condoned.

Given the lack of any violation of movants' substantive enumerated CVRA rights, the Court perceives the government's misstep on notice as the sort that is remediable only prospectively and not retrospectively. (Again, the Congress has given no indication whatsoever that it somehow intended the CVRA to waive sovereign immunity and allow a private right of action for damages against the United States, which is the only sort of retrospective relief the Court could make available for a violation of this nature.) Significantly, and happily, movants and the government appear to be working far more harmoniously and there has been no renewed complaint by movants or anyone else that the government is failing to comply with its obligation to affirmatively notify all potential victims (including any others impacted by the crimes charged in the 2006 superseding indictment) of (1) their rights under the CVRA and (2) of any major case events implicated by 18 U.S.C.A. § 3771(a)(2). Of course, the Court will remain vigilant and

27

sensitive so that, consistent with the commands of Rubin's constitutional right to due process, that the rights of any victim of Rubin and / or RIG will be assured of their rights under the CVRA.

III.    Conclusion

Mindful of the important rights conferred by the CVRA and the noble impulses that motivated the Act's creation, the Court observes that there are substantial limitations, some of practical and others of constitutional dimension, on the ability of a crime victim to "enforce" certain of their enumerated rights. Practically, courts and the government are tasked with ensuring appropriate notice to victims, but, until alerted by a victim who did not receive formal notice (but obviously now had actual notice), a court can do nothing beyond its original order requiring CVRA notice be given to ensure compliance by the government with the notice requirement of the Act. As for actual clashes between victim and government over the best way to convict, punish and seek restitution from a criminal wrongdoer, how can the court presiding over the prosecution of the defendant referee any spat between government and victim about how best to make the accused pay for his, at that point, only charged criminal conduct?

Nonwithstanding any legitimacy to assertions that this prosecution has long overstayed its welcome, it must be recalled that the original indictment (2004) and the crimes it charged antedated the CVRA. Additionally, some of the conduct to which movants except, to the extent that the conduct occurred after the enactment of the CVRA, took place before the filing of the superseding indictment in May 2006, when it can be said that movants achieved covered status under the CVRA. Relief relating to events or omissions timing has carved out is, therefore, denied.[15] As to other relief demanded, movants chose not to seek a delay in sentencing and were

---

[15] Certain other demands for relief, e.g., the unsealing of plea allocutions by certain co-defendants, are terminated by the withdrawal of the relevant demand for relief.

accorded the right to be "reasonably heard" at the sentencing hearing. It is ordered, however, that movants will be allowed to participate in any post-sentence restitution hearings that the Court will conduct. The re-opening of pleas by Rubin and others is denied. A remand date was set at the sentencing hearing, without objection by movants or any party. No further action on that request is required at this time. The Court also determines that with respect to any past breach by the government of any enumerated CVRA right of movants that retrospective relief, in the form of damages or otherwise, is unavailable and, therefore, denied.

With that having been said, the Court will remain vigilant as to its and the government's actual obligations under the CVRA, particularly with respect to notice and the reasonable opportunity to be heard. Consistent with this Memorandum and Order and the rulings made at the time of argument in open court, the motion is granted to the extent that the government is ordered to comply with its notice and consultative obligations to movants under the CVRA and to treat them and their concerns with dignity, fairness and respect and that movants and other victims be given the opportunity to be heard reasonably at the post-sentence hearing on restitution.

SO ORDERED.

Dated: Brooklyn, New York
       June 11, 2008

s/ENV

_____

ERIC N. VITALIANO
United States District Judge